**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LORI-ANNE ALBANO, MYJORIE PHILIPPE, REBECCA TELARO, and ALYSSA ROSE, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>      v.<br><br>HAIN CELESTIAL GROUP, INC., BEECH-NUT NUTRITION COMPANY, GERBER PRODUCTS COMPANY, and NURTURE, INC.,<br><br>                    Defendants. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Lori-Anne Albano, Myjorie Philippe, Rebecca Telaro, and Alyssa Rose ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action suit for damages and equitable relief against Defendants Hain Celestial Group, Inc. ("Hain"), Beech-Nut Nutrition Company ("Beech-Nut"), Gerber Products Company ("Gerber") and Nurture, Inc. ("Nurture") (collectively, "Defendants" unless otherwise stated). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, on the investigation of their counsel, and on information and belief as to all other allegations:

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action on behalf of themselves and other all other parents and

1

persons nationwide who bought Defendants' baby food products containing harmful heavy metals such as inorganic arsenic, lead, cadmium, and mercury.  The products at issue include, but are not limited to, the following:

- Hain's Earth's Best Whole Grain Rice Cereal, Whole Grain Oatmeal Cereal, and Sweet Potatoes Organic Baby Food (referred to herein as "Earth's Best Products");

- Beech-Nut's Rice Single Grain Baby Cereal, Classic Sweet Potatoes, Naturals Just Sweet Potatoes, and Classic Mixed Vegetables (referred to herein as "Beech-Nut Products");

- Gerber's Puffs, Lil'Crunchies, and Yogurt Melts (referred to herein as "Gerber Products"); and

- Nurture's Happy Family Organic's HappyBABY Puffs, HappyBABY Rice Cakes, HappyBABY Creamies, HappyBABY Teethers and HappyBABY Yogis (referred to herein as "HappyBABY Products").[1]

2.    Numerous scientific studies conducted over the last several decades have confirmed that inorganic arsenic, lead, cadmium, and mercury are developmental neurotoxins that are harmful to a baby's developing brain and nervous system.  There are no established safe levels of these substances for baby foods.

3.    Babies and children who consume inorganic arsenic, lead, cadmium, or mercury are at risk of suffering health problems, a loss of intellectual capacity and behavioral problems such as attention-deficit/hyperactivity disorder ("ADHD"), among other things.  Even the consumption of small amounts over time can increase the risk of bladder, lung and skin cancer, and Type 2 Diabetes. Moreover, medical professionals and scientists alike agree that early exposure to heavy metals can have long-term effects that are irreversible.

4.    On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform issued a detailed report titled, *Baby Foods*

---

[1] Plaintiffs reserve the right to expand the list of Hain, Beech-Nut, Gerber and HappyBABY products specifically identified herein as their investigation continues and/or they have had an opportunity to conduct discovery.

*are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* ("Report").  The Report revealed that some of the largest baby food manufacturers in an industry that generates over $50 billion annually in sales knowingly distributed and sold baby food containing harmful heavy metals such as inorganic arsenic, lead, cadmium, and mercury.  Hain, Beech-Nut, Gerber, and Nurture were identified as four of the companies knowingly selling baby foods containing harmful heavy metals.

5.      Hain manufactures, warrants, advertises, and sells the Earth's Best Products as being suitable and safe for consumption by babies.  Hain uniformly depicts babies on the package labeling, and states that products are food for babies.  Hain also says on its baby foods that "All Babies Begin Life Wholesome . . . Feed Them Accordingly," and "From the first spoonful on, you can be sure your baby's rapidly developing little body is getting only organic nutrition."  Hain's food labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Earth's Best Products are safe and suitable for consumption by babies.

6.      Beech-Nut manufactures, warrants, advertises, and sells the Beech-Nut Products as being suitable and safe for consumption by babies.  Beech-Nut uniformly states that its products are food for babies and disclaims the use of unwanted ingredients.  Beech-Nut's food labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Beech-Nut Products are safe and suitable for consumption by babies.

7.      Gerber also manufactures, warrants, advertises, and sells its products as being suitable and safe for consumption by babies. For example, all the Gerber Product labels have the famous "Gerber Baby" logo, as well as indications that the product is appropriate for crawling or sitting babies. Gerber also claims that its products "meet the standards of the FDA" and that Gerber has "among the strictest standards in the world." In fact, Gerber claims that every jar of their baby food goes "through over 100 quality checks." Gerber's food labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that Gerber products are safe and suitable for consumption by babies.

8.      Nurture manufactures, warrants, advertises, and sells the HappyBABY Products as being suitable and safe for consumption by babies.  Among other things, Nurture uniformly represents on the package labeling that the HappyBABY Products are for crawling or sitting babies, created by

real moms, real parents, pediatricians, and nutritionists who are on "a mission to bring health and happiness to our little ones and the planet." Defendant also claims to create "nutritious meals and snacks," and states that it has an "ENLIGHTENED NUTRITION PHILOSOPHY." Nurture's food labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the HappyBABY Products are safe and suitable for consumption by babies.

9.      As alleged herein, Defendants' marketing and advertising of their products is false, deceptive, and misleading to reasonable consumers because Defendants know that heavy metals are harmful to babies yet sold products containing harmful heavy metals as evidenced by their own testing. Defendants' marketing and advertising of their products is also false, deceptive, and misleading to reasonable consumers because Defendants failed to warn and disclose material facts regarding their products, namely, that they were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that their internal testing showed that their products contained harmful heavy metals; and that their internal policies permitted the sale of baby food products with harmful heavy metals. The Defendants' distribution and sale of these products was unlawful, unfair, false, and misleading, and the Defendants were unjustly enriched at the expense of Plaintiffs and Class members.

10.      Plaintiffs and Class members would not have purchased the Earth's Best, Beech-Nut, Gerber or HappyBABY Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendants' testing showed that their products contained harmful heavy metals; or that their policies permitted the sale of baby food products with harmful levels of heavy metals.

11.      Plaintiffs bring this action and assert claims on behalf of themselves and all other similarly situated persons (defined below) for fraud, deceptive, false, and misleading advertising and business practices, and unjust enrichment.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of

interests and costs; the number of members of the proposed Class exceeds 100; and many members of the proposed Class are citizens of different states than the Defendant.

13.    This Court has personal jurisdiction over Defendant Hain Celestial Group, Inc. because Defendant is headquartered in the State of New York, regularly conducts business in this Judicial District, and has extensive contacts with this forum.

14.    This Court has personal jurisdiction over Defendant Beech-Nut Nutrition Company because Defendant is headquartered in the State of New York, regularly conducts business in this Judicial District, and has extensive contacts with this forum.

15.    This Court has personal jurisdiction over Defendant Gerber Products, Co. because Defendant regularly sells and markets its products in this District, and Defendant derives substantial revenue from sales of its products in New York, with the knowledge that its products are being marketed and sold for use in this State.

16.    This Court has personal jurisdiction over Defendant Nurture, Inc. because Defendant is headquartered in the State of New York, regularly conducts business in this Judicial District, and has extensive contacts with this forum.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants transact substantial business in this District.

18.    This Court has supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

## THE PARTIES

### Plaintiffs

19.    Plaintiff Lori-Anne Albano is a resident and citizen of New York. Plaintiff has bought Gerber baby food, puffs, and snacks from Walmart and Target retail stores in various locations around her home in Levittown, New York. Plaintiff has regularly purchased these products since 2019 and reviewed and relied on the representations on the packaging and believed the products to be safe and suitable for babies.  Plaintiff Albano's purchases took place during a time in which third-party testing showed that the Gerber products contained harmful heavy metals.  If Plaintiff Albano had known that the products were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the

heavy metals; that testing showed that these products contained harmful heavy metals; or that the Defendant's policies permitted the sales of products with harmful levels of heavy metals, Plaintiff Albano would not have purchased the products or would have paid less for them.

20.    Plaintiff Myjorie Philippe is a resident and citizen of Massachusetts.  Plaintiff has bought HappyBABY Puffs and Rice Cakes from Shaw's, Target, Whole Foods, and Market Basket retail stores in various locations in Massachusetts, including Marlborough, Groton, Leominster, Hudson, Shrewsbury, and Worcester.  Plaintiff has regularly purchased these products since 2017, reviewed and relied on the representations on the packaging, and believed the products to be safe and suitable for babies.  Plaintiff Philippe's purchases took place during a time in which Defendant's testing showed that HappyBABY Puffs and Rice Cakes contained harmful heavy metals.  If Plaintiff Philippe had known that the HappyBABY Puffs and Rice Cakes were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that Nurture's testing showed that its products contained harmful heavy metals; or that Nurture's policies permitted the sales of products with harmful levels of heavy metals, Plaintiff Philippe would not have purchased the HappyBABY Puffs or Rice Cakes or would have paid less for them.

21.    Plaintiff Rebecca Telaro is a resident and citizen of New York.  Plaintiff Telaro has bought HappyBABY Puffs and Rice Cakes from Target, Tops Friendly Markets, Walmart, and Wegman's retail stores in various locations in New York, including in Farmington and Victor. Plaintiff Telaro has regularly purchased these products since 2018 and reviewed, relied on the representations on the packaging, and believed the products to be safe and suitable for babies. Plaintiff Telaro's purchases took place during a time in which Defendant's testing showed that HappyBABY Puffs and Rice Cakes contained harmful heavy metals. If Plaintiff Telaro had known that the HappyBABY Puffs and Rice Cakes were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that Nurture's testing showed that its products contained harmful heavy metals; or that Nurture's policies permitted the sales of products with harmful levels of heavy metals, Plaintiff Telaro would not have purchased the HappyBABY Puffs or Rice Cakes or would have paid less for them.

22.    Plaintiff Alyssa Rose is a resident and citizen of Pennsylvania. Plaintiff Rose has

bought Earth's Best Whole Grain Rice Cereal, Whole Grain Oatmeal Cereal, and Sweet Potatoes Organic Baby Food and Beech-Nut's Rice Single Grain Baby Cereal, Classic Sweet Carrots, Naturals Just Sweet Potatoes, and Classic Mixed Vegetables from Walmart and Giant Food retail stores in various locations around her home in Aston, Pennsylvania.  Plaintiff Rose has regularly purchased these products since 2017 and reviewed and relied on the representations on the packaging and believed the products to be safe and suitable for babies.  Plaintiff Rose's purchases took place during a time in which third-party testing showed that the Earth's Best and Beech-Nut Products contained harmful heavy metals.  If Plaintiff Rose had known that the products were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that testing showed that these products contained harmful heavy metals; or that the Defendant's policies permitted the sale of products with harmful levels of heavy metals, Plaintiff Rose would not have purchased the products or would have paid less for them.

### Defendants

23.    Defendant Hain Celestial Group, Inc. is a citizen of Delaware, where it is incorporated, and New York because it maintains its principal place of business at 111 Marcus Avenue, Lake Success, New York. Defendant does business throughout the United States. Defendant's baby food products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

24.    Defendant Beech-Nut Nutrition Company is a citizen of New York, where it is incorporated and maintains its principal place of business at One Nutrition Place, Amsterdam, New York. Defendant does business throughout the United States. Defendant's baby food products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

25.    Defendant Gerber Products, Co. is a citizen of Delaware, where it is incorporated, and Virginia because it maintains its principal place of business at 1812 N. Moore St. Arlington, VA 22209. Defendant also does business throughout the United States. Defendant's baby food products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

26.    Defendant Nurture, Inc. is a citizen of Delaware, where it is incorporated, and New York because it maintains its principal place of business at 139 Fulton Street, New York, New York.

Defendant does business throughout the United States. Defendant's baby food products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

## FACTUAL ALLEGATIONS

### There are No Established Safe Levels of Heavy Metals in Baby Food

27.    According to the U.S. House of Representatives' Report, "Children's exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior." The Report highlights numerous studies conducted over the last several decades analyzing the effects of early exposure of heavy metals and concluding that the harm is long-standing and irreversible.

28.    Babies are particularly vulnerable to the effects from exposure to heavy metals because they are small, and their organs are developing. Specifically, exposure to heavy metals during a baby's developmental stage can lead to "'untreatable and frequently permanent' brain damage, which may result in 'reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior.'"[2] According to Tom Neltner, chemical policy director for the Environmental Defense Fund ("EDF") which has studied lead in food for 25 years, "Exposure to these toxic heavy metals affects babies' brain development and nervous system, it affects their behavior, permanently decreases IQ, and, if you want to boil it down to dollars, their lifetime earnings potential."

29.    A published study titled, *A Strategy for Comparing the Contributions of Environmental Chemicals and Other Risk Factors to Neurodevelopment of Children*, found that exposure to heavy metals such as lead are "associated with 40,131,518 total IQ point loss in 25.5 million children (or roughly 1.57 lost IQ points per child)—more than the total IQ losses associated with preterm birth (34,031,025), brain tumors (37,288) and traumatic brain injury (5,827,300) combined."[3]

30.    The Food and Drug Administration ("FDA") has concluded that inorganic arsenic, lead, cadmium, and mercury are hazardous to babies and children and have "no established health benefit" and "lead to illness, impairment, and in high doses, death." Further, even low levels of these heavy metals are concerning to health and well-being.

---

[2] Report at page 9.

[3] *Id.*

**Inorganic Arsenic**

31.     The consumption of arsenic can result in serious and life-threatening health problems. The Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") has ranked arsenic as the number one substance present in the environment that poses the most significant threat to human health.  The known health risks resulting from arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[4]

32.     There is no established safe level of inorganic arsenic for baby foods.  Consumer advocacy groups like Healthy Babies Bright Futures has advocated that there should be no measurable amount of inorganic arsenic in baby food, while Consumer Reports has advocated for a limit of 3 parts per billion ("ppb").

33.     For bottled water, the FDA has set a maximum level of arsenic at 10 ppb, while the Environmental Protection Agency ("EPA") and the World Health Organization ("WHO") have set a similar limit for drinking water.

34.     Several studies have found that arsenic has a significant negative effect on neurodevelopment in children, primarily in IQ levels.  For example, a study of schoolchildren in Maine who drank water with an arsenic concentration level of more than 5 ppb showed significant decreases in "Full Scale IQ, Working Memory, Perceptional Reasoning and Verbal Comprehension scores."[5]

35.     Another study of children in Spain concluded that an increase in arsenic exposure resulted in a reduction of a child's global, gross, and fine motor function scores, and that boys were

---

[4] Miguel Rodriguez-Barranco, et al. *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioral Disorders in Children: A Systematic Review and Met-Analysis* (June 1, 2013) (https://pubmed.ncbi.nlm.nih.gov/23570911) (last visited Feb. 10, 2021).

[5] Gail A. Wasserman, et al., *A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren* (Apr. 1, 2014) (https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23) (last visited Feb. 11, 2021).

more susceptible to the neurotoxicity of arsenic.[6]

## Lead

36.     According to the FDA, lead has no established health benefit.  Lead is the second substance, after arsenic, on the ATSDR's list of substances present in the environment potentially posing a significant threat to human health.  The consumption of low levels of lead from food and other sources has been found to contribute to 400,000 deaths every year.

37.     The Environmental Protection Agency ("EPA"), the Centers for Disease Control and Prevention ("CDC") and the American Academy of Pediatrics ("AAP") unanimously agree that there is no established "safe level of lead (Pb) in a child's blood; even low levels of Pb in the blood can result in behavior and learning problems, lower IQ and hyperactivity, slowed growth, hearing problems, and anemia."[7] Consistent with this assessment, the AAP and the Environmental Defense Fund have proposed a maximum of 1 ppb of lead in food for babies and children.

38.     The FDA has established a maximum daily intake of lead from food (called the Interim Reference Level) of 3 μg (or 3 ppb) for kids and 12.5 μg (or 12.5 ppb) for women of childbearing age. The consumer organization Healthy Babies Bright Future has advocated for a standard of zero lead in baby food while Consumer Reports advocates for no more than 1 ppb of lead in foods and drinks for babies and children.

39.     Outside the food context, the FDA has set a maximum limit on lead of 5 ppb for bottled water.  The EPA has set an action level of 15 ppb of lead for drinking water while the WHO has set 10 ppb as a provisional guideline.

40.     Studies have shown that even low levels of lead exposure can have a negative impact on children.  In two different studies of schoolchildren in Detroit and Chicago public schools, a significant inverse relationship was found between lead exposure and test scores.  The Detroit study, in particular, found a strong correlation between early childhood lead exposure and reduced standardized

---

[6] Antonio J. Signes-Pastor, et al., *Inorganic Arsenic Exposure and Neuropsychological Development of Children of 4-5 Years of Age Living in Spain* (Apr. 29, 2019) (www.ncbi.nlm.nih.gov/pmc/articles/PMC6541502/) (last visited Feb. 11, 2021).

[7] Valerie Zartarian, et al., *Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making* (Sept. 12, 2017) (https://ehp.niehs.nih.gov/doi/10.1289/ehp1605) (last visited Feb. 11, 2021).

test performance.[8]  In the Chicago study, higher blood level concentrations were linked to lower reading and math scores in third-grade children, with a substantial 32% increase in failing reading and math.[9]

41.    Early childhood lead exposure can result in permanent cognitive effects, as one study showed.  In that study, adults who had developmental delays associated with lead exposure continued to show cognitive deficits.[10]

42.    Several studies have also established a strong link between lead exposure and ADHD.[11]

43.    Jay Schneider, Ph.D., a professor of anatomy, pathology, and cell biology at Thomas Jefferson University in Philadelphia, has examined hundreds of children with lead exposure and believes that even the tiniest amounts of lead in children's food should be avoided.

**Cadmium**

44.    The ATSDR identifies cadmium as number seven on its list of substances present in the environment that potentially poses a significant threat to human health.  Cadmium, like inorganic arsenic, has been shown to affect a child's IQ level and the development of ADHD.

45.    Several federal and state agencies have regulated cadmium.  Pursuant to Proposition 65, California has identified cadmium as causing developmental and male reproductive toxicity and has set an oral Maximum Allowable Dose Level ("MADL") of 4.1 µg (or 4.1 ppb) per day.

46.    The FDA and EPA have set a maximum allowable limit of cadmium of 5 ppb in bottled water and drinking water.  The World Health Organization ("WHO") has set a maximum allowable limit of cadmium in drinking water at 3 ppb.

47.    Consumer groups have advocated for even stricter levels of cadmium in foods.  For

---

[8] Nanhua Zhang, et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence From Detroit Public Schools* (Mar. 2013) (https://pubmed.ncbi.nlm.nih.gov/23327265/) (last visited Feb. 11, 2021).

[9] Anne Evens, et al., *The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools: A Population-Based Retrospective Cohort Study* (Apr. 7, 2015) (https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9) (last visited Feb. 11, 2021).

[10] Maitreyi Mazumdar, et al., *Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function: A Follow-Up Study* (Mar. 30, 2011) (www.ncbi.nlm.nih.gov/pmc/articles/PMC3072933/) (last visited Feb. 11, 2021).

[11] Gabriele Donzelli, et al., *The Association Between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review* (Jan. 29, 2019) (www.mdpi.com/1660-4601/16/3/382/htm).

example, Healthy Babies Bright Futures has advocated that no measurable amount of cadmium should be in baby foods, while Consumer Reports has advocated for a limit of 1 ppb of cadmium in fruit juices.

48.    A study examining the effect of cadmium exposure on children concluded that it negatively impacted Full Scale IQ and in particular, boys.  According to the 2018 study, boys "exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure."[12]

49.    Another 2018 study found a link between cadmium exposure and ADHD and concluded that ADHD was more prevalent among children with the high cadmium exposure as compared to the control group.[13]

### Mercury

50.    Mercury is the number three substance on ATSDR's list of substances in the environment potentially posing a significant threat to human health.

51.    As with inorganic arsenic, lead, and cadmium, Healthy Babies Bright Futures advocates for a goal of zero levels of mercury in baby food.  Outside the baby food context, the FDA has set a limit of 2 ppb of mercury in bottled water, while the EPA has set a limit of 2 ppb for drinking water.

52.    Mercury's effect on children's development has been studied in the context of a pregnant woman's exposure to mercury.  Pre-natal "mercury exposure has been consistently associated with adverse subsequent neuro-development."[14]

### THE EARTH'S BEST PRODUCTS

### Hain Represented that the Earth's Best Products are Safe and Suitable for Babies

53.    Hain manufacturers, distributes, and sells food for babies under the brand name Earth's

---

[12] Report at 12 (citing Klara Gustin, et al., *Cadmium Exposure and Cognitive Abilities and Behavior at 10 Years of Age: A Prospective Cohort Study* (Apr. 2018) (https://pubmed.ncbi.nlm.nih.gov/29459184/) (last visited Feb. 11, 2021).

[13] Min-Jing Lee, et al., *Heavy Metals' Effects on Susceptibility to Attention-Deficit/Hyperactivity Disorder: Implication of Lead, Cadmium, and Antimony* (June 10, 2018) (https://pubmed.ncbi.nlm.nih.gov/29890770/) (last visited Feb. 11, 2021).

[14] Margaret R. Karagas, et al., *Evidence on the Human Health Effects of Low-Level Methylmercury Exposure* (June 1, 2012) (https://pubmed.ncbi.nlm.nih.gov/22275730/) (last visited Feb. 11, 2021).

Best.  To gain the trust of the consuming public, Hain touts itself as a family company that cares about the health of babies and kids and the foods they eat.  On its website at www.earthsbest.com, Hain promises to produce "pure, quality products" that parents "can trust."

54.    Defendant uniformly markets, advertises, represents, and warrants the Earth's Best Products as safe and suitable for consumption by babies.

55.    On the front of the label of the Earth's Best Products, Defendant depicts sitting and/or standing babies.  With regard to the Earth's Best Whole Grain Rice Cereal, Hain represents that it is "Babies Perfect Solid Food" in conspicuous letters on the front of the label and on the back, Hain represents, "All Babies Begin Life 100% Pure . . . Feed Them Accordingly."  Further, Hain also says on the back of the product, "From the first spoonful on, you can be sure your baby's rapidly developing little body is getting only pure, healthy, organic, nutrition."  Defendant's labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Earth's Best Whole Grain Rice Cereal products are safe and suitable for consumption by babies.

56.    Below are examples of the front and back labels of the Whole Grain Rice Cereal:




57.     With regard to the Earth's Best Whole Grain Oatmeal Cereal, Hain represents that it is "For Babies Ready to Move Beyond Rice Cereal," in conspicuous letters on the front of the label and on the back, Hain represents, "All Babies Begin Life 100% Pure . . . Feed Them Accordingly." Defendant's labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Earth's Best Whole Grain Oatmeal Cereal products are safe and suitable for consumption by babies.

58.     Below are examples of the front and back labels of the Earth's Best Whole Grain Oatmeal Cereal product:

 

59.     Hain has offered the Earth's Best Sweet Potatoes Organic Baby Food in a jar in two versions:  Sweet Potatoes Organic Baby Food 1, and Sweet Potatoes Organic Baby Food 2.  Hain represents that Sweet Potatoes Organic Baby Food 1 is for babies four months or older and has represented that Sweet Potatoes Organic Baby Food 2 is for babies six months or older.  Defendant's

labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Earth's Best Sweet Potatoes Organic Baby Food products are safe and suitable for consumption by babies.

60.    Below are examples of the front and back labels of the Earth's Best Sweet Potatoes Organic Baby Foods products:



**Hain Knowingly Sold Unsafe, Finished Baby Foods Containing Heavy Metals**

61.    In February 2021, the U.S. House of Representatives issued the Report revealing to the public for the first time that certain companies knowingly sold baby foods containing excessive levels of heavy metals, such as inorganic arsenic, lead, cadmium, and mercury.  The Report identified Hain as one of those companies.

62.    According to the Report, Hain sold finished baby food products and ingredients with harmful heavy metals, such as inorganic arsenic, lead and cadmium, even though such ingredients exceeded internal levels that Hain set.

63.    For example, regarding inorganic arsenic, Hain sold finished baby food products

containing as much as 129 ppb inorganic arsenic, and ingredients testing as high as 309 ppb arsenic.

64.     With regard to lead, Hain used many ingredients with high levels.  Some ingredients that Hain used had as much as 352 ppb lead; in particular, 88 ingredients tested over 20 ppb lead and six tested over 200 ppb lead.

65.     As to cadmium, Hain used ingredients that tested as high as 260 ppb; in particular, 102 ingredients tested had over 20 ppb cadmium.

66.     Hain has also added vitamin/mineral pre-mixes having high levels of toxic heavy metals into its baby foods.

67.     In a meeting with the FDA, Hain tried to justify its failure to adhere to its own internal limits based on what it called "theoretical calculations," even despite conceding to the FDA that its testing "underestimated final product toxic heavy metals."[15]  Further, while Hain admitted that it does not regularly test finished baby foods for inorganic arsenic, when it did test a small sample of finished product, its testing revealed 129 ppb inorganic arsenic.

68.     Testing conducted by the Healthy Babies Bright Futures group confirms that Earth's Best Products, including those identified here, had harmful heavy metals.

69.     Despite touting itself as a family company that cares about quality baby food that parents can trust, and conveying through statements on product labeling that the Earth's Best Products are safe and suitable for babies, Hain sold food products that were unsafe for babies and also failed to warn and disclose material facts, including that its products contained harmful heavy metals, including inorganic arsenic, lead, cadmium, and/or mercury.

## THE BEECH-NUT PRODUCTS

### Beech-Nut Represented that its Beech-Nut Products are Safe and Suitable for Babies

70.     Beech-Nut manufacturers, distributes, and sells food for babies under the brand name Beech-Nut.  To gain the trust of the consuming public, Beech-Nut paints itself as a company that, since 1931, has offered real food for babies that is healthier and undergoes rigorous testing for harmful ingredients.   According to its website at www.beechnut.com, Defendant promises that "Making high

---

[15] Report at 5.

quality, safe, and nutritious foods for babies and toddlers will always be our #1 priority."

71.     Defendant uniformly markets, advertises, represents, and warrants the Beech-Nut Products as safe and suitable for consumption by babies.

72.     Regarding the Beech-Nut Rice Single Grain Baby Cereal, Beech-Nut represents that the cereal is for babies four months and over.  On the back of the label, Defendant again represents that the food is for babies and that it does not contain harmful ingredients, such as BPA.  Defendant's labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Beech-Nut Rice Single Grain Baby Cereal products are safe and suitable for consumption by babies.

73.     Below are examples of the front and back labels of the Beech-Nut Rice Single Grain Baby Cereal:



74.    Defendant also offers baby food in jars that are simply designed to convey that they contain wholesome and pure ingredients.  Regarding the Classic Sweet Carrots baby food, on the front of the jar, Beech-Nut says that the product is for babies six months or over and around the lid of the jar, Beech-Nut repeatedly states that nothing artificial is added.

75.    Below are examples of the front and back labels of the Beech-Nut Classic Sweet Carrots baby food:



76.    As to the Beech-Nut Naturals Just Sweet Potatoes, on the front of the jar Beech-Nut says the product is for babies who are four months or older and around the lid of the jar, Beech-Nut repeatedly states "real food for babies."

77.    Below are examples of the front and back labels of the Beech-Nut Naturals Just Sweet Potatoes:

 

78. Regarding the Classic Mixed Vegetables, on the front of the jar, Beech-Nut says it is for babies six months or older and around the lid of the jar, Beech-Nut repeatedly states that the food has "nothing artificial added."

79. Below are examples of the front and back labels of the Beech-Nut Classic Mixed

 

Vegetables product:

### Beech-Nut Knowingly Sold Unsafe, Finished Baby Foods Containing Heavy Metals

80.     The congressional report released on February 4, 2021 also identified Beech-Nut as a company that knowingly sold baby food products with ingredients testing high in toxic heavy metals. Beech-Nut indicated that it did not test final products, but instead only ingredients.

81.     According to the Report, internal testing documents show that "Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic" and "routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."[16]

82.      In particular, internal documents show that the ingredient "Rice Flour," which Beech-Nut uses in the Beech-Nut Rice Single Grain Baby Cereal, repeatedly tested over 100 ppb and sometimes as high as 170 ppb. Worse, it appears that Beech-Nut set a limit of 100 ppb and instead of rejecting the ingredients that tested above that level, Beech-Nut used them.  Other ingredients that Beech-Nut used in its baby food products, such as Amylase, BAN 800, Alpha Amylase and Sebamyl 100, are enzymes that tested in the range of 353 ppb to 913.40 ppb arsenic.

83.     Although there is no established safe limit for lead in baby food, Beech-Nut used ingredients testing at extremely high lead levels, such as 886.9 ppb.  According to the Report, Beech-Nut used 57 ingredients that contained over 20 ppb lead, which is four times the limit the FDA has set for bottled water.  For example, in testing commissioned by Healthy Babies Bright Futures, the Classics Sweet Carrots contained 27.2 ppb lead, while the Naturals Just Sweet Potatoes contained 14.1 ppb lead and the Classic Mixed Vegetables contained 17.9 ppb lead.

84.      Regarding cadmium, Beech-Nut used ingredients testing at over 100 ppb, which is 20 times more than the limit for bottled water.  Testing commissioned by Healthy Babies Bright Futures shows that the Beech-Nut Products tested for cadmium in harmful levels.

85.     Internal documents identified in the Report show that Beech-Nut did not even test its

---

[16] Report at 3.

baby food products for mercury, while the Health Babies Bright Future showed that they did contain mercury.

86.    All the Beech-Nut Products specified herein, and others, have tested positive for harmful toxic heavy metals.

87.    Despite touting itself as a company that prioritizes making safe and nutritious baby food, and conveying through statements on product labeling that the Beech-Nut Products are safe and suitable for babies, Beech-Nut sold food products that were unsafe for babies and also failed to warn and disclose material facts, including that its products contained harmful heavy metals, including inorganic arsenic, lead, cadmium, and/or mercury.

## THE HAPPYBABY PRODUCTS

### Nurture Represented that the HappyBABY Products are Safe and Suitable for Babies

88.    Nurture manufacturers, distributes, and sells food for babies under the brand name Happy Family Organics and offers several lines of baby food, including HappyBABY and HappyTOT. To gain the trust of the consuming public, Nurture touts the Happy Family Organics brand as a family company that cares about the health of babies and kids and the foods they eat. According to its website at www.happyfamilyorganics.com, it develops "personal relationships with farmers and partners we trust to make our products—so you can feel as good about nourishing your family as we do."

89.    Defendant uniformly markets, advertises, represents, and warrants the HappyBABY Products as safe and suitable for consumption by babies.

90.    Regarding the HappyBABY Puffs, on the front of the label in conspicuous font, Defendant represents that the food is for "crawling bab[ies]."  On the back of the label, Defendant says in capital letters: "WE ARE A TEAM OF REAL PARENTS, PEDIATRICANS AND NUTRIONISTS on a mission to bring health and happiness to our little ones and the planet."  Defendant also claims to create "nutritious meals and snacks" which it calls "superfoods," and that it has an "ENLIGHTENED NUTRITION PHILOSOPHY."  Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the HappyBABY Puffs are safe and suitable for consumption by babies.

91.    The HappyBABY Puffs are sold in several flavors: Apple & Broccoli Puffs; Banana & Pumpkin Puffs; Kale & Spinach Puffs; Sweet Potato & Carrot Puffs; Strawberry & Beet Puffs; and Purple Carrot & Blueberry Puffs.

92.    Below are examples of the front and back labels of the HappyBABY Puffs product:

 

93.    Regarding the HappyBABY Rice Cakes, on the front of the label in conspicuous font, Defendant represents that the food is for "crawling bab[ies]."  On the back of the label, Defendant says in capital letters: "WE ARE REAL MOMS, PEDIATRICANS AND NUTRIONISTS on a mission to bring health and happiness to our little ones and the planet."  Defendant also claims to create "nutritious meals and snacks," that it has an "ENLIGHTENED NUTRITION PHILOSOPHY," and that the packaging is made without BPA.  Defendant's statements, taken together and considered as a whole from the perspective of a reasonable consumer, convey that the HappyBABY Rice Cakes are safe and suitable for consumption by babies.   The HappyBABY Rice Cakes are sold in two flavors: Apple and Blueberry & Beet.

94.    Below are examples of the front and back labels of the HappyBABY Rice Cakes product:

 

95.    On the front of the label in conspicuous font, Defendant represents that the HappyBABY Creamies are for "crawling bab[ies]."  On the back of the label, Defendant says in capital letters: "WE ARE REAL MOMS, PEDIATRICANS AND NUTRIONISTS on a mission to bring health and happiness to our little ones and the planet."  Defendant also claims to create "nutritious meals and snacks," and states that it has an "ENLIGHTENED NUTRITION PHILOSOPHY."  Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the HappyBABY Creamies are safe and suitable for consumption by babies and children.   The HappyBABY Creamies are sold in two flavors: Strawberry, Raspberry and Carrot; and Apple, Spinach, Pea and Kiwi.

96.     Below are examples of the front and back labels of the HappyBABY Creamies product:




97.     On the front of the label in conspicuous font, Defendant represents that the HappyBABY Teethers are for "sitting bab[ies]."  On the back of the label, Defendant says in capital letters: "WE ARE REAL MOMS, PEDIATRICANS AND NUTRIONISTS on a mission to bring health and happiness to our little ones and the planet."  Defendant also claims to create "nutritious meals and snacks," and that it has an "ENLIGHTENED NUTRITION PHILOSOPHY."  Defendant disclaims the use of unwanted ingredients.  Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the HappyBABY Teethers are safe and suitable for consumption by babies.

98.     Below are examples of the front and back labels of the HappyBABY Teethers product:

 

99.     On the front of the label in conspicuous font, Defendant represents that the HappyBABY Yogis are for "crawling bab[ies]."  On the back of the label, Defendant says in capital letters: "WE ARE REAL MOMS, PEDIATRICANS AND NUTRIONISTS on a mission to bring health and happiness to our little ones and the planet."  Defendant also claims to create "nutritious meals and snacks," and that it has an "ENLIGHTENED NUTRITION PHILOSOPHY."  Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the HappyBABY Yogis are safe and suitable for consumption by babies.

100.    Below are examples of the front and back labels of the HappyBABY Yogis product:

 

**Nurture Knowingly Sold Unsafe, Finished Baby Foods Containing Heavy Metals**

101.    In February 2021, the U.S. House of Representatives issued the Report revealing to the public for the first time that certain companies knowingly sold baby foods containing excessive levels of heavy metals, such as inorganic arsenic, lead, cadmium, and mercury.  The Report identified Nurture as one of those companies.

102.    According to the Report, Nurture sold finished baby food products, including the HappyBABY Products, despite internal testing showing that the products were unsafe because they contained harmful heavy metals that even failed Nurture's own internal limits and which were unsafe for babies.

103.    For example, regarding inorganic arsenic, Nurture set an internal limit of 100 ppb, even though there is no established safe level of arsenic for baby foods.  Further, Nurture's 100 ppb lead is 10 times more than the limit that the FDA has set for bottled water and that the EPA and WHO have set for drinking water.  Also egregious is that Nurture's testing of its HappyBABY Products surpassed its own internal limit of 100 ppb for inorganic arsenic, as set forth in this chart which contains a few

examples of the testing results for HappyBABY Products:

| Parameter | Product Name | Goal Threshhold | Result | Date of Test Report |
|---|---|---|---|---|
| Lead | | | | |
| | Blueberry Purple Carrot Greek Yogis | 100 | 641 | 1/27/2017 |
| | Multi-Grain Cereal Canister | 100 | 580 | 8/30/2017 |
| | Pea Spinach Teether | 100 | 55 | 12/12/2018 |
| | Apple Spinach Pea Kiwi Creamies | 100 | 42 | 5/31/2018 |
| | Pea Spinach Teether | 100 | 23 | 07/11/19 |
| | Apple Spinach Pea & Kiwi | 100 | 43 | 3/29/2019 |

104.    Regarding lead, Nurture set an internal limit of 100 ppb, even though there is no amount of lead in a child's blood which is considered safe.  Moreover, Nurture's internal limit of 100 ppb is 33 times more than the FDA's Interim Reference Level of 3 ppb of lead for food consumed by children.  Further, Nurture's testing of its HappyBABY Products surpassed its already excessive internal limit as set forth in the below chart, which shows just a few examples of the testing results for the HappyBABY Products:

| Parameter | Product Name | Goal Threshhold | Result | Date of Test Report |
|---|---|---|---|---|
| Inorganic Arsenic | | | | |
| | Apple & Broccoli Puffs | 100 | 180 | 11/1/2017 |
| | Apple Rice Cakes | 100 | 130 | 2/8/2017 |
| | Sweet Potato & Carrot Puffs | 100 | 122 | 9/13/2018 |
| | Apple & Broccoli Puffs | 100 | 115 | 10/15/2018 |
| | Strawberry & Beet Puffs | 100 | 114 | 3/21/2019 |
| | Apple & Broccoli Puffs | 100 | 107 | 5/30/2019 |

105.    As to cadmium, Nurture set a limit of 50 ppb for cadmium, which is 10 times more than the limit the FDA and EPA have set for bottled water and drinking water, respectively.  Internal testing showed that Nurture knowingly sold HappyBABY Products having as high as 49 ppb cadmium, or 10 times the amount allowed by the FDA and EPA for bottled and drinking water, and 12 times the maximum limit set by Proposition 65, as set forth in the below chart:

/ / /

/ / /

/ / /

| Parameter | Product Name | Goal Threshhold | Result | Date of Test Report |
|---|---|---|---|---|
| Cadmium | | | | |
| | Multi-Grain Cereal Canister | 50 | 49 | 8/30/2017 |
| | Strawberry Raspberry Carrot Creamies | 50 | 36 | 12/6/2017 |
| | Kale & Spinach Puffs | 50 | 21 | 9/21/2018 |
| | Strawberry Raspberry Carrot Creamies | 50 | 31 | 10/23/2018 |
| | Carrots | 50 | 29 | 4/11/2019 |
| | Kale & Spinach Puffs | 50 | 35 | 10/09/19 |

106.    As the above testing shows, from 2017 to 2019 and possibly later, Nurture sold baby food products that had harmful levels of inorganic arsenic, lead, and cadmium.  Twenty-nine products that Nurture sold tested at over 100 ppb inorganic arsenic.  Numerous finished products that Nurture tested and sold had over 20 ppb lead, and numerous other products that Nurture tested and sold had over 5 ppb cadmium.  Several HappyBABY food products also contained mercury.

107.    Despite touting itself as a family company that cares about babies and children and aims to provide nutritious and healthy foods, and conveying through statements on product labeling that the HappyBABY Products are safe and suitable for babies, Nurture sold food products that were unsafe for babies and also failed to warn and disclose material facts, including that its HappyBABY Products contained harmful heavy metals, including inorganic arsenic, lead, and cadmium.

## THE GERBER PRODUCTS

### Gerber Represented that the Gerber Products are Safe and Suitable for Babies

108.    Gerber manufacturers, distributes, and sells food for babies and offers of a wide variety of different food products such as traditional baby food purees, baby cereals, puffs, and rice cakes.  To gain the trust of the consuming public, Gerber holds itself out as company that cares about the health of babies and kids and the foods they eat. According to its website at www.gerber.com, "100% of our products meet all FDA requirements." Gerber claims to do "[o]ver 100 quality checks in every jar" throughout "5 different stages of safety and quality checks from farm to spoon," and promises that "[t]he health and safety of your little one has been and will always be our highest priority."

109.    Defendant uniformly markets, advertises, represents, and warrants that its products are safe and suitable for consumption by babies.

110.    For starters, every label of a Gerber product features the famous "Gerber Baby" that the company is known for. The Gerber Puffs label also clearly depicts a crawling baby and indicates that the puffs are intended for "Crawler" babies, age 8+ months.   Defendant also markets its Puffs as supporting "brain development and learning ability." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Gerber Puffs are safe and suitable for consumption by babies.

111.    The Gerber Puffs are sold in several flavors: Strawberry Apple, Banana, Blueberry, Sweet Potato, Vanilla, Apple Cinnamon, Peach, Organic Cranberry Orange, Organic Fig Berry, and Organic Apple Puffs.

112.    Below is an example of the front label of the Gerber Puffs product:



113.    Regarding the Gerber Lil'Crunchies, on the front of the label is the famous "Gerber Baby," as well as a clear depiction of a crawling baby and indicates that the Lil'Crunchies are intended

for "Crawler" babies, age 8+ months. The packaging also touts the fact that the Lil'Crunchies are "Baked with Whole Grains." The Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Lil'Crunchies are safe and suitable for consumption by babies. The Gerber Lil'Crunchies are sold in several flavors, including: Mild Cheddar, Veggie Dip, Garden Tomato, Apple Sweet Potato, Ranch, Vanilla Maple, Organic White Cheddar Broccoli, and Organic White Bean Hummus.

114.    Below are examples of the front labels of the Gerber Lil'Crunchies product:



115.    Gerber's Yogurt Melts products also depict the famous "Gerber Baby," as well as a depiction of a crawling baby and indicates that the Gerber Yogurt Melts are intended for "Crawler" babies, age 8+ months. The packaging also touts the fact that the Gerber Yogurt Melts are "made with real fruit." The Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Yogurt Melts are safe and suitable for consumption by babies. The Gerber Yogurt Melts are sold in several flavors, including: Strawberry, Very Berry Blend, Truly Tropical Blend, Mixed Berries, Banana Vanilla, Peach, Organic Banana Strawberry, and

Organic Red Berries.

116.     Below are examples of the front labels of the Gerber Yogurt Melts product:





**Gerber Knowingly Sold Unsafe, Finished Baby Foods Containing Heavy Metals**

117.     In February 2021, the U.S. House of Representatives issued the Report revealing to the public for the first time that certain companies knowingly sold baby foods containing excessive levels of heavy metals, such as inorganic arsenic, lead, cadmium, and mercury.  The Report identified Gerber as one of those companies.

118.     According to the Report, Gerber sold finished baby food products, despite internal testing showing that the products were unsafe because they contained ingredients with high levels of harmful heavy metals which are unsafe for babies.

119.     For example, regarding inorganic arsenic, Gerber's own testing showed that Gerber was routinely using rice flour that contained over 90 ppb of inorganic arsenic, even though there is no

established safe level of arsenic for baby foods.  This is nearly 10 times more than the limit that the FDA has set for bottled water and that the EPA and WHO have set for drinking water.

120.    Regarding lead, Gerber's own limited lead testing showed ingredients, such as sweet potatoes, with as high as 48 ppb of lead, even though there is no amount of lead in a child's blood which is considered safe.  Moreover, this is over 15 times the FDA's Interim Reference Level of 3 ppb of lead for food consumed by children.

121.    As to cadmium, the Congressional Report showed that Gerber used ingredients containing as much as 87 ppb, far exceeding the 5ppb allowed by the FDA and EPA for bottled and drinking water.  Testing also showed that some products contained mercury.

122.    As the above testing shows, from 2017 to 2019 and possibly later, Gerber sold baby food products that had harmful levels of inorganic arsenic, lead, cadmium and/or mercury.  Third-party testing has also shown that numerous Gerber products, including Gerber Puffs, Gerber Melts, and other Gerber snacks contain excessively high amounts of inorganic arsenic, lead, cadmium and or mercury.[17]

123.    Despite touting itself as a family company that cares about babies and children and aims to provide nutritious and healthy foods, and conveying through statements on product labeling that the Gerber Products are safe and suitable for babies, Gerber also sold food products that were unsafe for babies and also failed to warn and disclose material facts, including that its products contained harmful heavy metals, including inorganic arsenic, lead, cadmium, and/or mercury.

## CLASS ACTION ALLEGATIONS

124.    Plaintiffs bring this action on behalf of themselves and on behalf of the following proposed Class initially defined as follows: All persons residing in the United States who purchased for personal, family, or household use, from 2017 to the present, one or more Earth's Best Products, Beech-Nut Products, Gerber Products and/or HappyBABY Products  ("National Class").

125.    Plaintiffs also bring this action on behalf of themselves and a Massachusetts State

---

[17] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

class defined as follows: All persons residing in Massachusetts who purchased for personal, family, or household use, from 2017 to the present, one or more HappyBABY Products ("Nurture Massachusetts State Class").

126.    Plaintiffs also bring this action on behalf of themselves and a Pennsylvania State class defined as follows: All persons residing in Pennsylvania who purchased for personal, family, or household use, from 2017 to the present, one or more Earth's Best Products ("Earth's Best Pennsylvania State Class").

127.    Plaintiffs also bring this action on behalf of themselves and a Pennsylvania State class defined as follows: All persons residing in Pennsylvania who purchased for personal, family, or household use, from 2017 to the present, one or more Beech-Nut Products ("Beech-Nut Pennsylvania Class").

128.    Plaintiffs also bring this action on behalf of themselves and a New York State class defined as follows: All persons residing in New York who purchased for personal, family, or household use, from 2017 to the present, one or more Gerber Products ("Gerber New York Class").

129.    Plaintiffs also bring this action on behalf of themselves and a New York State class defined as follows: All persons residing in New York who purchased for personal, family, or household use, from 2017 to the present, one or more HappyBABY Products ("Nurture New York State Class").

130.    Excluded from the proposed National Class, Hain and Beech-Nut Pennsylvania Classes, Nurture Massachusetts State Class, and Gerber and Nurture New York State Classes (collectively referred to herein as "Class" unless otherwise noted) are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

131.    Plaintiffs reserve the right to re-define any of the Class definitions prior to class certification and after having the opportunity to conduct discovery.

132.    This action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil

Procedure.

## Numerosity of the Proposed Class

### (Fed. R. Civ. P. 23(a)(1))

133.    The members of the Class are so numerous that their individual joinder would be impracticable. The Class comprises at least hundreds of thousands of consumers. The precise number of Class members, and their addresses, are unknown to Plaintiffs at this time, but can be ascertained from Defendants' records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, supplemented (if deemed necessary or appropriate by the Court) by published notice.

## Predominance of Common Questions of Fact and Law

### (Fed. R. Civ. P. 23(a)(2); 23(b)(3))

134.    Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual members of the Class. The common legal and factual questions include, without limitation:

(a)    Whether Defendants knew their products contained harmful heavy metals that rendered their baby food products unsafe for babies;

(b)    Whether each Defendants' affirmative representations about their products, when considered as a whole, were false and misleading to reasonable consumers because the products were unsafe for babies, contained harmful heavy metals as Defendants' internal testing showed, and because Defendants' internal policies permitted the sale of the products with harmful levels of heavy metals;

(c)    Whether Defendants failed to warn and disclose material facts regarding their products, namely, that they were unsafe for babies; that they contained heavy metals or the level of heavy metals; that the Defendants' testing showed that their products contained harmful heavy metals; and that the Defendants' policies permitted the sale of the products with harmful levels of heavy metals;

(d)    Whether Defendants violated the state consumer protection statutes alleged herein;

(e)    Whether Defendants were unjustly enriched; and

(f)    The nature of the relief, including damages and equitable relief, to which

Plaintiffs and the members of the Class are entitled.

### Typicality of Claims

### (Fed. R. Civ. P. 23(a)(3))

135.    Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other

Class members, purchased Defendants' products, suffered damages as a result of that purchase, and

seek the same relief as the proposed Class members.

### Adequacy of Representation

### (Fed. R. Civ. P. 23(a)(4))

136.    Plaintiffs are adequate representatives of the Class because their interests do not

conflict with the interests of the members of the Class, and they have retained counsel competent and

experienced in complex class action and consumer litigation.

137.    Plaintiffs and their counsel will fairly and adequately protect the interest of the

members of the Class.

### Superiority of a Class Action

### (Fed. R. Civ. P. 23(b)(3))

138.    A class action is superior to other available means for the fair and efficient adjudication

of the claims of Plaintiffs and members of the Class.  There is no special interest in Class members

individually controlling the prosecution of separate actions.  The damages suffered by individual

members of the Class, while significant, are small given the burden and expense of individual

prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Further, it

would be virtually impossible for the members of the Class individually to redress effectively the

wrongs done to them. And, even if members of the Class themselves could afford such individual

litigation; the court system could not, given the thousands or even millions of cases that would need to

be filed. Individualized litigation would also present a potential for inconsistent or contradictory

judgments. Individualized litigation would increase the delay and expense to all parties and the court

system, given the complex legal and factual issues involved. By contrast, the class action device

presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief

### (Fed. R. Civ. P. 23(b)(1) and (2))

139.    In the alternative, this action may properly be maintained as a class action, because:

(a)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for each Defendant; or

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

### Issue Certification

### (Fed. R. Civ. P. 23(c)(4))

140.    In the alternative, the common questions of fact and law, set forth in Paragraph 134, are appropriate for issue certification on behalf of the proposed Class.

### FIRST CAUSE OF ACTION

### Violations of the New York General Business Law § 349
### N.Y. Gen. Bus. Law § 349
### (On Behalf of Plaintiffs Albano and Telaro and the Gerber and Nurture New York State Classes Against Defendants Gerber and Nurture)

141.    Plaintiffs Albano and Telaro hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

142.    Plaintiffs Albano and Telaro and the Gerber and Nurture New York State Class members (referred to herein as "Class members" for purposes of this count) and Defendants are

"persons" under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

143.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

144.    The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.  Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

145.    In the course of business, Defendants violated N.Y. Gen. Bus. Law § 349 by making false or misleading statements on food labels which are deemed misbranded and prohibited by New York's Agriculture and Marketing Law, AGM § 201.

146.    In the course of business, Defendants made affirmative misrepresentations that conveyed to Plaintiffs and Class members that the HappyBABY and Gerber Products were safe and suitable for babies.  Defendants, however, concealed and suppressed material facts concerning the HappyBABY and Gerber Products, including that the HappyBABY and Gerber Products were unsafe and unsuitable for babies; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the HappyBABY and Gerber products contained harmful heavy metals; and that Defendants' policies permitted the sale of products with harmful levels of heavy metals.

147.    Plaintiffs and Class members had no way of discerning that Defendants' representations were false and misleading because Class members did not have access to Defendants' internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

148.    Defendants thus violated the Act by making statements, when considered as a whole from the perspective of the reasonable consumer, that conveyed that the HappyBABY and Gerber Products were safe and suitable for babies.  Defendants also failed to disclose and warn that the HappyBABY and Gerber Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; and that Defendants' policies permitted the sale of products with harmful levels of heavy metals.

149.    Defendants intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the HappyBABY and Gerber Products with intent to mislead Class members.

150.    Defendants knew or should have known that their conduct violated the NY DAPA and the AGM § 201.

151.    Defendants owed the Class a duty to disclose the true and unsafe nature of the HappyBABY and Gerber Products.

152.    Defendants' concealment of the true characteristics of the HappyBABY and Gerber Products was material to Class members.

153.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs Albano and Telaro and Class members, about the true nature of the HappyBABY and Gerber Products.

154.    Plaintiff Albano and Telaro and Class members would not have purchased the HappyBABY or Gerber Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendants' testing showed that their products contained harmful heavy metals; or that Defendants' policies permitted the sales of products with harmful levels of heavy metals.

155.    Defendants' violations present a continuing risk to Plaintiffs Albano and Telaro and the New York State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

156.    Plaintiffs Albano and Telaro and Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all customers and the public to refrain from unfair and deceptive practices under the NY DAPA. Plaintiffs Albano and Telaro and all Class members suffered ascertainable loss because of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

157.    As a direct and proximate result of Defendants' violations of the NY DAPA, Plaintiffs and Class members have suffered injury-in-fact and/or actual damage.

158.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs Albano and Telaro and Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

**SECOND CAUSE OF ACTION**

**Violations of the New York General Business Law § 350**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiffs Albano and Telaro and the Gerber and**
**Nurture New York State Classes Against Defendants Gerber and Nurture)**

159.    Plaintiffs Albano and Telaro incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

160.    Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

161.    The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . ." N.Y. Gen. Bus. Law § 350-a.

162.    Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading.

163.    Defendants made numerous material and affirmative misrepresentations and omissions of fact with intent to mislead and deceive concerning the HappyBABY and Gerber Products, particularly concerning their unsafe nature. Specifically, Defendants intentionally concealed and suppressed material facts concerning the HappyBABY and Gerber Products, namely, that they were unsafe and unsuitable for babies; that they contained heavy metals or the level of heavy metals; that

Defendants' testing showed that their products contained harmful heavy metals; and that Defendants' policies permitted the sale of products with harmful levels of heavy metals.  Defendants intentionally and grossly defrauded and mislead Class members concerning the true and unsafe nature of the HappyBABY and Gerber Products.

164.    The misrepresentations and omissions regarding the HappyBABY and Gerber Products set forth herein were material and likely to deceive a reasonable consumer.

165.    Defendants intentionally and knowingly misrepresented material facts regarding the HappyBABY and Gerber Products with intent to mislead Plaintiffs Albano Telaro and Class members.

166.    Defendants' false advertising was likely to and did in fact deceive reasonable consumers, including Class members, about the true characteristics of the HappyBABY and Gerber Products, and the quality of Defendants' brands.

167.    Plaintiffs Albano Telaro and Class members would not have purchased the HappyBABY and Gerber Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendants' testing showed that its products contained harmful heavy metals; or that Defendants' policies permitted the sales of products with harmful levels of heavy metals.

168.    Defendants' violations of the NY FAA present a continuing risk to Class members and to the general public. Defendants' deceptive acts and practices affect the public interest.

169.    Class members have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendants' false advertising in violation of the NY FAA.

170.    The Class members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 for each Class member. Because Defendants' conduct was committed willingly and knowingly, Class members are entitled to recover three times actual damages, up to $10,000.

171.    The Class also seeks an order enjoining Defendants' false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

## THIRD CAUSE OF ACTION

**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
73 P.S.  §  201-1 *et seq.*
(On Behalf of Plaintiff Rose and the Earth's Best and
Beech-Nut Pennsylvania Classes Against Defendants Hain and Beech-Nut)**

172.    Plaintiff Alyssa Rose hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

173.    Plaintiff Alyssa Rose brings this claim on behalf of herself and the Pennsylvania Classes against Defendants Hain and Beech-Nut.

174.    Plaintiff, Defendants, and the members of the Pennsylvania Classes are "persons" within the meaning of 73 P.S. § 201-2(2).

175.    The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201 3.

176.    In the course of business, Defendants made affirmative misrepresentations that conveyed to Plaintiff and Class members that the Earth's Best and Beech-Nut Products were safe and suitable for babies.  Defendants, however, concealed and suppressed material facts concerning the Earth's Best and Beech-Nut Products, including that the Earth's Best and Beech-Nut Products were unsafe and unsuitable for babies; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the Earth's Best and Beech-Nut Products contained harmful heavy metals; and that Defendants' policies permitted the sale of products with harmful levels of heavy metals.

177.    Plaintiffs and Class members had no way of discerning that Defendants' representations were false and misleading because Class members did not have access to Defendants' internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

178.    Defendants thus violated the Act by making statements, when considered as a whole from the perspective of the reasonable consumer, that conveyed that the Earth's Best and Beech-Nut Products were safe and suitable for babies.  Defendants also failed to disclose and warn that the Earth's Best and Beech-Nut Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained

41

harmful heavy metals; and that Defendants' policies permitted the sale of products with harmful levels of heavy metals.

179.    Defendants intentionally and knowingly misrepresented material facts regarding the Earth's Best and Beech-Nut Products with intent to mislead Plaintiff and the members of the Pennsylvania Classes.

180.    Defendants knew or should have known that their conduct violated the Pennsylvania UTPA.

181.    Defendants owed the Pennsylvania State Class a duty to disclose the true and unsafe nature of the Earth's Best and Beech-Nut Products.

182.    Defendants' concealment of the true characteristics of the Earth's Best and Beech-Nut Products was material to Class members.

183.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Class members, about the true nature of the Earth's Best and Beech-Nut Products.

184.    Plaintiff Rose and Class members would not have purchased the Earth's Best or Beech-Nut Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendants' testing showed that its products contained harmful heavy metals; or that Defendants' policies permitted the sales of products with harmful levels of heavy metals.

185.    Defendants' violations present a continuing risk to the Class members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

186.    Plaintiff and Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA. Plaintiff and Class members suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

187.    As a direct and proximate result of Defendants' violations of the Pennsylvania UTPA,

Pennsylvania Class members have suffered injury-in-fact and/or actual damage.

188.     Pursuant to 73 P.S. § 201-9.2(a), Plaintiff and the Pennsylvania Classes seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

## FOURTH CAUSE OF ACTION

**Unjust Enrichment**
**(On Behalf of all Plaintiffs, the National Class,**
**the Earth's Best and Beech-Nut Pennsylvania Classes, the Gerber and Nurture New York**
**Classes, and the Nurture Massachusetts Class Against all Defendants)**

189.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

190.     Plaintiffs and Class members conferred benefits upon Defendants. Plaintiffs and Class members paid money for Defendants' Earth's Best, Beech-Nut, Gerber and HappyBABY Products that were unsafe and not suitable for babies.  Defendants have unjustly retained the benefits conferred upon by Plaintiffs and Class members.

191.     Defendants retained those benefits under circumstances that make it inequitable for Defendants to retain such benefits. Specifically, Defendants retained those benefits even though the Earth's Best, Beech-Nut, Gerber and HappyBABY Products contain harmful heavy metals that render the Earth's Best, Beech-Nut, Gerber and HappyBABY Products unsafe and unsuitable for consumption by babies.  If Plaintiffs and Class members had known the true nature of the Earth's Best, Beech-Nut, Gerber, and HappyBABY Products, they would not have paid money for them or would have paid less.

192.     Plaintiffs and Class members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

## FIFTH CAUSE OF ACTION

**Fraud**
**(Concealment and Omissions)**
**(On Behalf of all Plaintiffs, the National Class,**
**the Hain and Beech-Nut Pennsylvania Class, the Gerber and Nurture New York Classes,**
**and the Nurture Massachusetts Class Against all Defendants)**

193.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

194.    Defendants made affirmative misrepresentations, partial-truths, and purposefully concealed the true facts on each package of the Earth's Best, Beech-Nut, Gerber, and HappyBABY Products.  Defendants made these misrepresentations, partial truths to, and concealed the truth from, Plaintiffs and Class members about the Earth's Best, Beech-Nut, Gerber and HappyBABY Products knowing that the products contained harmful heavy metals, the level of heavy metals, or that internal policies permitted Defendants to sell products containing harmful heavy metals.

195.    Defendants' representations and partial truths were false. As a result of Defendants' false and misleading statements and deceptions, and omissions, Defendants achieved their desired result—to sell products that they otherwise would not have or at higher prices.

196.    Defendants knew that their misrepresentations and omissions in this regard were false and/or misleading.  Defendants have been aware of the falsity and misleading nature of their affirmative misrepresentations and omissions for several years.

197.    Defendants had a duty to disclose the material facts alleged herein because they had exclusive and superior access to, and knowledge about, the levels of heavy metals in their foods and their internal testing policies and limits.  Defendants also had a duty to disclose because they made affirmative representations to Plaintiffs and Class members, and the general public about the nature, quality, and characteristics of the Earth's Best, Beech-Nut, Gerber, and HappyBABY Products.  Specifically, Defendants affirmatively represented that the Earth's Best, Beech-Nut, Gerber, and HappyBABY Products were suitable and safe for babies when they knew this was false and/or misleading.  This duty applied at the time Plaintiffs and Class members purchased the Earth's Best, Beech-Nut, Gerber, and HappyBABY Products, and it continues to apply today.

198.    Defendants intended for Plaintiffs and Class members to rely on their misrepresentations and omissions.  Defendants engaged in this course of conduct to sell the Earth's Best, Beech-Nut, Gerber, and HappyBABY Products in the United States market with disregard of the unsafe nature of the products for babies.  Defendants' acts were done wantonly, maliciously, oppressively, and deliberately, with the intent to defraud Plaintiffs and Class members and with reckless and conscious disregard for Plaintiffs' and Class members' rights.

199.    Defendants' misrepresentations, partial-truths, and omissions were material to Plaintiffs' and Class members' decision to buy the Earth's Best, Beech-Nut, Gerber and HappyBABY Products.  Defendants were aware—and exploited—the fact that Plaintiffs and Class members turned to them and trusted them to sell safe baby food and to disclose material facts.

200.    Plaintiffs and Class members could not have discovered the truth about the Earth's Best, Beech-Nut, Gerber and HappyBABY Products as Defendants concealed these facts from the public until they were asked to comply with a congressional investigation and the Report became public.  Plaintiffs and Class members could not have otherwise known of Defendants' scheme and ongoing deception.

201.    Plaintiffs and Class members reasonably relied on the representations and omissions in purchasing the Earth's Best, Beech-Nut, Gerber, and HappyBABY Products.  Had Defendants disclosed to Plaintiffs and Class members the material facts alleged herein on the product packaging, Plaintiffs and Class members would have seen such disclosures as they relied on Defendants' representations.  Further, had Plaintiffs and Class members known the truth about the Earth's Best, Beech-Nut, Gerber and HappyBABY Products and the true characteristics of the products, they would not have acted as they did.  Plaintiffs and Class members would not have purchased the Earth's Best, Beech-Nut, Gerber, and HappyBABY Products, or they would have paid less for such products.

202.    Plaintiffs and Class members were injured by their reliance on Defendants' misrepresentations, partial-truths, and omissions.  Plaintiffs and Class members have been damaged because they purchased products that were unsafe for babies and not as represented, and, because of that deception have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, pray for relief and judgment against Defendants as follows:

A.      Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as a representative of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.      Awarding Plaintiffs and the Class compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

C.      Awarding Plaintiffs and the Class appropriate relief, including actual and statutory damages;

D.      For punitive damages;

E.      For declaratory and equitable relief, including restitution and disgorgement;

F.      For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

G.      Awarding Plaintiffs and the Class the costs of prosecuting this action, including expert witness fees;

H.      Awarding Plaintiffs and the Class reasonable attorneys' fees and costs as allowable by law;

I.      Awarding pre-judgment and post-judgment interest; and

J.      Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 2, 2021

By: */s/ Eric A. Kafka*
Eric A. Kafka (EK8746)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street
14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
ekafka@cohenmilstein.com

Douglas J. McNamara (DJM 6069)
Geoffrey A. Graber (*pro hac vice* forthcoming)
Brian E. Johnson (*pro hac vice* forthcoming)
Paul M. Stephan (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699
dmcnamara@cohenmilstein.com
ggraber@cohenmilstein.com
bejohnson@cohenmilstein.com
pstephan@cohenmilstein.com

Rosemary M. Rivas (*pro hac vice* forthcoming)
Mark Troutman (*pro hac vice* forthcoming)
Rosanne L. Mah (*pro hac vice* forthcoming)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
rmr@classlawgroup.com

*Attorneys for Plaintiffs and the Proposed
Class Members*